## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN MICHIGAN

GABRIELLE CORRENT,

     Plaintiff,

                                       Case No:

v.

                                       Hon.

COOPER STANDARD AUTOMOTIVE, INC.,
a foreign corporation, JEFFREY S. EDWARDS, and
JOANNA TOTSKY, LARRY OTT,

     Defendants.

---

SCOTT P. BATEY (P54711)
Batey Law Firm, PLLC
Attorney for Plaintiff
30200 Telegraph Road, Suite 400
Bingham Farms, MI  48025
(248) 540-6800-telephone
(248) 540-6814-fax
sbatey@bateylaw.com

---

## **COMPLAINT AND JURY DEMAND**

     NOW COMES, Plaintiff, Gabrielle Corrent (hereinafter "Corrent"), by and through her attorney's Scott P. Batey and the Batey Law Firm, PLLC, and for her Complaint against Defendants states as follows:

     1.     Plaintiff, is a resident of the City of Northville, County of Oakland and State of Michigan.

     2.     Defendant, Cooper Standard Automotive, Inc. (hereinafter "CSA"), is

a foreign corporation duly authorized to do business in the southeastern district of Michigan.

3.      Defendant, Jeffrey S. Edwards ("Edwards") is an individual who is a resident of the southeastern district of Michigan and is the Chief Executive Officer ("CEO") of Defendant, CSA.

4.      Defendant, Joanna Totsky ("Totsky") is an individual who is a resident of the southeastern district of Michigan and is a Senior Vice President, Chief Legal Officer and Secretary of Defendant, CSA.

5.      Defendant, Larry Ott ("Ott") is an individual who is a resident of the southeastern district of Michigan and is Senior Vice President and Chief Human Resources Officer for Defendant, CSA.

6.      Jurisdiction and venue are proper in the District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1331 and § 1391(b) & (c).

7.      Plaintiff brings this action for damages stemming from the acts and/or omissions of Defendants constituting violations of Michigan Whistleblowers' Protection Act, MCLA 15.361, et seq., MSA 17.428(1), *et seq.*, the Whistleblowers provision of Sarbanes-Oxley 18 U.S. Code § 1514A and the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act 15 U.S.C. §§ 78u-6(h)(1)(A)(iii) which have caused significant emotional and economic damages to Plaintiff.

8.      The amount in controversy exceeds $75,000.00 and is otherwise within

the Jurisdiction of this Court.

## **GENERAL ALLEGATIONS**

9.      Plaintiff incorporates by reference paragraphs 1 through 9 of the Complaint as though fully set forth herein.

10.      On October 1, 2018 Plaintiff began her employment with CSA as Vice President of Corporate Strategy and Mergers & Acquisitions a position where she was compensated quite handsomely and she reported directly to Defendant, Edwards and also served as a member of the Global Leadership Team ("GLT").

11.      Defendant, CSA is a publicly traded Tier I automotive supplier.

12.      Plaintiff quickly proved herself to be a valuable addition to the CSA team and in December, 2018 during a 1-on-1 meeting with Defendant, Edwards, he stated that in effort to obtain a seat on a Board of Directors ("BOD") she should become more active in external organizations, and specifically indicated that she should follow-up with Sharon Wenzel, Chief Communications & Community Affairs Officer to get involved with "Inforum" a Michigan based organization advocating women and diversity.

13.      Plaintiff attended two Inforum meetings which required an attendance fee that was paid by Defendant, CSA as part of Plaintiff's efforts to increase her visibility and position herself for a Board seat as instructed by Defendant, Edwards.

14.      In a February, 2019 1-on-1 with Defendant, Edwards, he told her that

the Board of Directors had been quite impressed by her presentation in the January Board meeting, and he questioned whether she was currently pursuing any Board service opportunities.

15.    Plaintiff indicated that she was not, because she believed she should focus solely on her career and did not have much time to even consider it seriously with a young family and other obligations.

16.    In response, Defendant, Edwards encouraged her to start looking into opportunities, because "your background would be attractive and more companies want female representation" and that they would continue the discussion when she returned from an upcoming trip to Europe.

17.    In March, 2019, Advisory Cloud, as well as several other services contacted Plaintiff who indicated that she would be open to learning more about their service.

18.    On April 1, 2019 in a 1-on-1 with Defendant, Edwards, he asked Plaintiff if she had made any progress in pursuing opportunities for a Board seat.

19.    Plaintiff indicated that she had started looking up a few options but nothing materialized and Edwards told her to contact Spencer Stuart, an HR firm used by CSA to see how they may help her find opportunities.

20.    Plaintiff also told Defendant, Edwards that she had been contacted by Advisory Board and other online companies to join their content and raise her

visibility, but that there were significant fees associated with joining some of them.

21.    Defendant, Edwards told her not to worry that CSA would pay for any fees.

22.    Following Plaintiff's 1-on-1 meeting with Defendant, Edwards, Plaintiff emailed Defendant, Ott asking for the details CSA's contacts at Spencer Stuart.  Plaintiff's email stated:

> Jeff mentioned to me this morning that I should get in touch with your contact at Spencer Stuart, as he is encouraging me to pursue BOD opportunities and indicated that your contact would be able to assist me. I believe he said Christie or similar name, hope this rings a bell.
>
> Thanks in advance.

23.    In response, Mr. Ott provided Plaintiff with Christie Coplen's contact information who Plaintiff emailed later that day:

> Good afternoon Christine,
>
> Hope this email finds you well.  I think we met briefly in person last month at the dinner following the Aspire Leadership workshop, and I have now received your contact details from Larry as I'm hoping you may be able to assist me with a new request.  Jeff Edwards, our CEO, indicated that you would be able to assist me in pursuing BOD membership opportunities, which he and I are both interested in identifying.  As I don't have any experience in serving on a board, I'm also not overly familiar with the process to identify such opportunities (other than the quite frequent solicitation type requests that I've received through various placement firms, but non I've explored seriously), so really looking for your guidance as to how to even being the conversation.
>
> Please let me know your thoughts if best to discuss via brief call, or in person meeting, or how else we may proceed.

5

Thanks in advance.

24.     On April 15, 2019 Plaintiff had a phone conversation with Ms. Coplen, who indicated that Plaintiff was still too early in her career to be seriously considered for Board roles but recommended that she starting getting involved in non-profit boards and/or online services that connect individuals with various networks and advisory opportunities.

25.     On April 24, 2019 in response to Ms. Coplen's suggestion, Plaintiff joined the Advisory Cloud online platform in effort to comply with Defendant, Edwards' directives.

26.     The only reason Plaintiff joined Advisory Cloud was due to Defendant, Edwards' instructions.

27.     There was a fee of almost $2,000 to join Advisory Cloud for which Plaintiff received an email invoice.

28.     As an executive at CSA Plaintiff was able to charge up to $5,000 on her P-Card without having the amount formally approved, although Defendant, Edwards had previously authorized such a charge in February.

29.     As Defendant, Edwards had told Plaintiff that CSA would pay for it so Plaintiff submitted the invoice for payment to Jon Banas' Administrative Assistant, Christine Shirkey who upon information and belief paid the invoice using a P-Card and filed the invoice accordingly.

30.     Plaintiff did not have her own Administrative Assistant and was told to use Ms. Shirkey for purposes such as this.

31.     In May / June, 2019 a representative from Advisory Cloud emailed Plaintiff asking if they may interview her (via email) to highlight her interest in discussing matters of diversity.

32.     On June 24, 2019 Plaintiff submitted responses to the interview questions which clearly indicated that she was "incredibly passionate about women's collaboration and leadership and view it as a privilege to be seen as an example for earlier-career women, that I may share my experiences and that they may learn from my journey."

33.     The June 24, 2019 response would be the only substantive interaction Plaintiff had with Advisory Board.

34.     In July and August, 2019 Plaintiff had a series of meetings with Defendants, Edwards and Ott to discuss the upcoming retirement of SVP, Ms. Wenzel, where Edwards and Ott told Plaintiff of CPS's plans to promote Plaintiff to an SVP and assume a large portion of Ms. Wenzel's duties effective January 1, 2020.

35.     Plaintiff was also told that her promotion would include a significant increase in pay to bring her in line with what the other SVPs were earning, as well as a large increase in her bonus package.

36.     On October 16 and 17, 2019 Plaintiff attended a series of 2 day "2020

Budget Meetings."

37.    Jeff DeBest, President, AMS - Advanced Material Science presented the revenue and financial projections or 'budget' for the AMS business for 2020, and revenue and financial projections for 2021 through 2024 meant to serve as the 'long-term plan'; where 2020 revenue was stated at $1million and subsequent years were presented as $68 million, $150 million, $267 million and $320 million for 2021 through 2024, respectively.

38.    During Mr. DeBest's presentation, Jeffrey Edwards, Defendants' CEO interrupted him and demanded that AMS 2020 revenue be set at $200 million, an increase of $199 million above Mr. DeBest's commitment.

39.    Following the 2020 Budget Meetings Plaintiff had a number of communications with Aleks Miziolek, Chief Transformation Officer and former Sr. Vice President, General Counsel and Ken Joung, Director Business Development, AMS regarding Defendant, Edwards' demand that the financial projections be increased so dramatically.

40.    Ms. Miziolek and Mr. Joung provided Plaintiff with insight into realistic or substantiated revenue projections for the AMS business for 2020 which were in the range of $1 million to $5 million and their concerns that the AMS business was being pressured to over-state budget commitments to a magnitude well above reasonable expectations.

41.     On October 23, 2019 CSA announced that effective January 1, 2020 Plaintiff was being promoted and now in addition to her current duties would oversee CSA's Corporate, Digital and Marketing Communication as part of its Global Organization-Phase 2.

42.     On October 30, 2019 Defendant, Edwards called Plaintiff into his office and told her "I know Aleks is sharing things with you, but she doesn't really know what's going on so don't listen to her."

43.     In the afternoon of October 30, 2019 Plaintiff attended a meeting with Jeff DeBest and Edwards in which DeBest also expressed concern that Edwards' $200 million projection for AMS was unrealistic, particularly "since pricing isn't even established."

44.     The following day, on October 31, 2019 Defendant, Edwards uninvited Plaintiff from attending the Bair Investor Conference on November 6th and 7th which he had only invited her to, the month prior.

45.     On November 1, 2019 Plaintiff attended her 1-on-1 with Defendant, Edwards who told her he had to force Mr. DeBest "to have a significant emotional event" to get him on board with the AMS projections and that "sometimes people need to experience a significant emotional event in front of an audience to drive their loyalty and obedience."

46.     In the afternoon of November 1st Plaintiff made a verbal complaint to

9

Joanna Totsky, Sr. Vice President, General Counsel, that Mr. Edward's demanded to overstate revenue projections for the AMS business, and inquired whether she or Chief Financial Officer, Jon Banas would be informing the Board of Directors ("BOD") that Defendant, Edwards was instructing the team to overstate revenue in order to manipulate the stock price, because if she or Banas did not report Edwards conduct to the BOD, Plaintiff would.

47.     Plaintiff explained to Defendant, Totsky that in the twelve (12) months period between October, 2018 to October, 2019, the stock price of the company had declined from approx. $143/share to approximately $30 a share, an 80% decrease in the company's value (market capitalization decreased from approximately $2.5 Billion to $500 million.

48.     Plaintiff explained her belief that Defendant, Edwards was motivated to overstate the 2020 revenue projection for the AMS business to drive external investor confidence in the growth and potential success of the AMS business, which was a key strategic aspect of the company's go-forward business model, and ultimately to manipulate an increase to the stock price and company valuation.

49.     At the time Plaintiff made her complaint to Defendant, Totsky, Totsky was an attorney licensed with the State of Michigan and a public body under the Michigan Whistleblowers Act.

50.     Plaintiff's complaints to Defendant Totsky were also protected under

Sarbanes-Oxley and Dodd-Frank as Defendant, Totsky had supervisory authority over Plaintiff and was a person employed by CSA with the authority to investigate, discover and terminate Edwards' misconduct and the act protected Plaintiff's threats of going to the BOD.

51.     Defendant, Totsky did not respond to Plaintiff's questions about reporting Defendant, Edwards to the BOD.

52.     Exactly one week later, on November 8, 2019 Defendant, Totsky informed Plaintiff that an anonymous complaint had been made against Plaintiff alleging that she was "running a consulting business."

53.     Defendant, Totsky told Plaintiff she did not have many details other than someone made a call to inform that they found evidence of her "running a consulting business online."

54.     Plaintiff, who was not involved in any "consulting business" concluded the alleged complaint must have been regarding an online profile to serve in an advisory capacity related to topics of diversity with an online company that Plaintiff had joined at the urging of Defendant, Edwards.

55.     Plaintiff asked if it was for an advisory profile "like GLG or Exec Ranks" because she could not remember the exact name of the profile she had joined.

56.     Defendant, Totsky asked what that was and Plaintiff explained to that in a December, 2018 Defendant, Edwards had started to encourage her to become

11

more visible and find a seat on another company's BOD.

57.    Plaintiff explained that she and Defendant, Edwards had a number of conversations about her obtaining a BOD seat and that Defendant, Edwards had offered advice on who to contract and who to speak with to find a BOD seat.

58.    Plaintiff told Totsky that she had joined an internet website called Advisory Board at the suggestion of Ms. Coplen in effort to put herself in a better position to receive a BOD seat.

59.    Plaintiff told Defendant, Totsky the only reason she joined Adviosry Board was because Defendant, Edwards instructed her to contact Ms. Coplen and do what Ms. Coplen suggested to be named to a BOD.

60.    From June 24th to November 8th, 2019 Plaintiff had no interaction with Advisory Cloud and on November 8th, 2019 she emailed and called Advisory Cloud to have her profile removed.

61.    Plaintiff explained to Defendant, Totsky that she never earned any money from Advisory Board and only joined Advisory Cloud to comply with the demands of Defendant, Edwards to gain a seat on a Board of Directors.

62.    Plaintiff found her Advisory Board profile online and shared it with Totsky who indicated that this was "no big deal" and that there would be no further resolution other than requesting for the online profile to be removed.

63.    A few days after discussing the alleged complaint against Plaintiff

with Defendant, Totsky, Plaintiff asked Defendant, Totsky again if she or Mr. Banas had gone to the Board of Directors with her concerns that Defendant, Edwards was attempting to manipulate the CSA stock price by overstating company financials on the AMS business.

64.     On November 12, 2019 Plaintiff learned that 2020 projections had been adjusted not to include the $200 million AMS projection as a direct result of Plaintiff's complaints to Defendant, Totsky and her threats to go to the BOD.

65.     On afternoon of November 13, 2019 Defendant, Totsky accused Plaintiff of violating company policies and conduct, and told Plaintiff she "had lied" and was "running an online consulting business."

66.     Defendant, Totsky's allegations against Plaintiff were pretextual and clearly in retaliation for Plaintiff's complaints that Defendant, Edwards was attempting to manipulate the CSA stock price and pretextual and her intention of alerting the BOD of Defendant, Edwards' illegal intentions.

67.     Defendant, Totsky's allegations were completely without merit as Plaintiff was not generating any income from Advisory Board, she had only joined the website at the instruction of Defendant, Edwards, CSA paid for the membership with Edwards' approval and she immediately withdrew her name from the website.

68.     Plaintiff further explained that while she never received any money from Advisory Board it was her understanding the only way she could have

generated revenue from Advisory Board was through speaking engagements which were capped at $500 per event and that Plaintiff had never had any speaking engagements and had not been active with Advisory Board.

69.    Plaintiff in further effort to rectify any issue, real or imagined offered to reimburse CSA the membership fee it paid on her behalf.

70.    It was apparent that Defendant, Totsky's allegations were driven purely by her and Edwards desire to retaliate against Plaintiff for her complaints that Edwards was trying to manipulate the stock price and her threats of going to the BOD, as even a company whose stock price had dropped more than 80% in the last year could not realistically believe that someone who had not generated any income was "running a business" or that person would risk a very highly paid executive position by "running a business" that was not generating any income or have her employer pay a $2,000 membership for an online profile unless it was previously approved by the Defendant, CEO.

71.    Plaintiff indicated to Defendant, Totsky that she found her tone inappropriate and requested that they continue the discussion with Defendant, Edwards and Larry Ott present.

72.    Later that day, Plaintiff texted Defendant, Edwards requesting to speak with him directly but he declined.

73.    On November 14th and 15th Plaintiff made multiple attempts to speak

with Defendant, Totsky, Defendant, Edwards and Mr. Ott regarding the allegations, hoping that Defendant, Edwards could clear up any confusion by telling Defendant, Totsky and Mr. Ott that she had spoken to him about Advisory Board and he had given his blessing that she join an online site to raise her visibility.

74.     On November 15, 2019 Plaintiff sent Defendants, Totsky and Ott an email setting forth why she had not done anything wrong and she thought joining Advisory Board "was the first step in preparing myself for a path Jeff and I had discussed."

75.     On November 15, 2019 Mr. Ott called Plaintiff and joined in the retaliation due to Plaintiff's complaints that Edwards was trying to manipulate the stock price and informed Plaintiff that an 'investigation' was being conducted into the allegations against her.

76.     Plaintiff asked him if he honestly believed she intended on using Advisory Board as a consulting business to which he did not respond indicating he did not honestly believe the allegations against her.

77.     Ott then attempted to coerce Plaintiff into resigning by telling her there were only two likely outcomes of the investigation, her termination or resignation.

78.     Plaintiff told him "I have no intention of resigning, as I have done nothing wrong" and asked why she could not speak with him or Defendant, Edwards in person.

79.    Ott replied "the facts will be as Joanna Totsky presented them, there is nothing more to discuss."

80.    Defendant, Ott continued to pressure Plaintiff by stating "I know you are a high-performer with  big career ambitions, so I would really advise you to think about how damaging a 'termination for cause' would be on your record" despite Plaintiff having done nothing to merit a termination for cause or otherwise.

81.    Defendant, Ott also told her "it's unfortunate that the announcement for your new role already went out, but at least you haven't received your title and promotion yet, so we can work out a way for you to resign and leave silently if you write a nice favorable thank you note to Jeff."

82.    Before he hung up Defendant, Ott warned he would give her time to think about it and "how much a scar of this will be on y9our record if you don't resign."

83.    On November 17, 2019 in an attempt to take the high road and save her career Plaintiff sent Defendant, Edwards an email apologizing for any misunderstanding and thanking him for nurturing her career.

84.    Plaintiff's email was sent because, while attempting to manipulate the CSA stock price, Edwards had actively supported Plaintiff, advised her that she was being  promoted to an SVP position and encouraged/ordered her to seek opportunities to serve on BODs, as well as the hope that if Defendant, Edwards

would reconsider the decision to retaliate against Plaintiff and come clean that he instructed Plaintiff to join a BOD and told Plaintiff, CSA would pay any membership fees associated with any website designed to raise her profile like Advisory Board.

85.    Instead of coming clean about his communications to Plaintiff, on November 18, 2019 Defendant, Edwards sent Plaintiff an email in which he lied and accused Plaintiff of "unauthorized use of company funds" when he knew he had authorized the use himself.

86.    On November 18, 2019 Plaintiff went on FMLA leave for anxiety and depression caused by Defendants false allegations and outright lies against her all in retaliation from her complaints of Defendant, Edwards' attempted stock manipulation.

87.    On November 27, 2019 Plaintiff submitted an email to the Board of Directors ("BOD"), seeking Whistleblower protection, and advising of the concerns that had been raised to her by Aleks Miziolek and Ken Joung and her own concerns and observations with Defendant, Edwards was attempting to manipulate the CSA stock price by overstating of revenue projections.

88.    Upon information and belief as a result of Plaintiff's complaints to Defendant, Totsky and the BOD, Defendant, CSA began an investigation into Plaintiff's allegations.

17

89.     Upon information and belief the investigation found no wrong doing on the part of Edwards because on November 13, 2019 Defendants decided not to include the $200 million revenue for AMS in their projections for 2020 as a result of Plaintiff's complaints.

90.     Plaintiff's complaints to Defendant, Totsky were protected activity under the Michigan Whistleblowers' Protection Act, MCLA 15.361, et seq., MSA 17.428(1), *et seq.* and Sarbanes-Oxley 18 U.S. Code § 1514A and her complaint to the BOD was a protected activity under Sarbanes-Oxley 18 U.S. Code § 1514A.

91.     Plaintiff was on short-term disability and FMLA leave from November 18, 2019 and February 10, 2020 when she received a mailed letter indicating that she was being terminated from the company effective immediately.

92.     Plaintiff had no valid performance issues and any alleged problems with Plaintiff's performance, attitude or disposition and any claims of the nature were completely fabricated to justify Plaintiff's termination.

93.     During the time period in question, Defendant was Plaintiff's employer and Plaintiff was their employee within the meaning of the WPA. Moreover, Defendant, was responsible for all acts committed by its agents, representatives and employees within the scope of their employment.

94.     At all times relevant, Plaintiff was acting as an employee of Defendant, CSA.

95.     Defendants' actions were intentional, or were carried out with reckless regard for Plaintiff's rights.

## COUNT I
## VIOLATIONS OF THE
## MICHIGAN'S WHISTLEBLOWERS' PROTECTION ACT

96.     Plaintiff incorporates by reference paragraphs 1 through 95 as though fully set forth herein.

97.     At all times, Plaintiff was an employee and Defendant was her employer covered by and within the meaning of the Whistleblowers' Protection Act, MCLA 15.361, et seq., MSA 17.428(1), *et seq*. ("WPA).

98.     Plaintiff was engaging in a protected activity when she reported a violation or suspected violation of a law or regulation or rule promulgated pursuant law of this state, a political subdivision of this state, or the United States to Defendant, Totsky who as an attorney qualifies as a "public body" under the WPA.

99.     Defendants, CSA, Edwards, Totsky and Ott violated the WPA when they discriminated against Plaintiff regarding the terms, conditions and privileges of her employment by retaliating against her and terminating her because she threatened to report a violation or suspected violation of a law, regulation, or rule of the State of Michigan and/or the United States of America, and opposed practices made illegal by the laws, regulations and rules of the State of Michigan and/or the United States of America.

100.   Defendants' actions were intentional.

101.   Defendants' stated reasons for terminating Plaintiff were pretextual as Plaintiff did not violate any company policy or engage in any consulting service and the factual basis of Defendants' pretextual stated reasons were due to Defendant, Edwards' instructions to Plaintiff.

102.   As a direct and proximate cause of Defendants' unlawful actions against Plaintiff, Plaintiff sustained, and will sustain in the future, injuries and damages, including, but not limited to, loss of earnings; loss of career opportunities; mental and emotional distress; loss of reputation and esteem in the community; and loss of the ordinary pleasures of everyday life, including the opportunity to pursue gainful occupation of choice.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants, in an amount in excess of $75,000.00, plus her reinstatement to the position she was to have assumed on January 1, 2020, exemplary damages, together with costs, interest and attorney fees and any other relief this Honorable Court deems appropriate.

**COUNT II**
**VIOLATIONS OF SARBANES-OXLEY AND DODD-FRANK**

103.   Plaintiff incorporates by reference paragraphs 1 through102 as though fully set forth herein.

104.   At all times, Plaintiff was an employee and Defendant was her

20

employer covered by and within the meaning of the Sarbanes-Oxley 18 U.S. Code § 1514A and the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act 15 U.S.C. §§ 78u-6(h)(1)(A)(iii).

105.   Plaintiff was engaging in a protected activity when she reported fraud and manipulation to Defendant, Totosky in connection with CSA's stock price and Defendant, Edwards' attempt to manipulate the CSA stock price by fraudulently inflating the projected 2020 revenues.

106.   Defendant, Totsky supervisory authority over Plaintiff and was a person employed by CSA with the authority to investigate, discover and terminate Edwards' misconduct and the act protected Plaintiff's threats of going to the BOD.

107.   Defendants violated Sarbanes-Oxley 18 U.S. Code § 1514A and the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act 15 U.S.C. §§ 78u-6(h)(1)(A)(iii) when they discriminated against Plaintiff regarding the terms, conditions and privileges of her employment by retaliating against her and terminating her because she reported  and threatened to the CSA BOD reported fraud and manipulation to Defendant, Totosky in connection with CSA's stock price and Defendant, Edwards' attempt to manipulate the CSA stock price by fraudulently inflating the projected 2020 revenues.

108.   Defendants' actions were intentional.

109.   Defendants' stated reasons for terminating Plaintiff were pretextual as

Plaintiff did not violate any company policy or engage in any consulting service and the factual basis of Defendants' pretextual stated reasons were due to Defendant, Edwards' instructions to Plaintiff.

110.   As a direct and proximate cause of Defendants' unlawful actions against Plaintiff, Plaintiff sustained, and will sustain in the future, injuries and damages, including, but not limited to, loss of earnings; loss of career opportunities; mental and emotional distress; loss of reputation and esteem in the community; and loss of the ordinary pleasures of everyday life, including the opportunity to pursue gainful occupation of choice.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants, in an amount in excess of $75,000.00, plus her reinstatement to the position she was to have assumed on January 1, 2020, exemplary damages, together with costs, interest and attorney fees and any other relief this Honorable Court deems appropriate.

## COUNT III
## VIOLATION OF THE FMLA

111.   Plaintiff incorporates by reference paragraphs 1 through 110 of the Complaint as though fully set forth herein.

112.   CSA was Plaintiff's "employer" within the meaning of the FMLA.

113.   Plaintiff suffered from a serious medical condition under FMLA.

114.   Plaintiff requested all disability leave and medical leave, including FMLA leave allowed under law after she was placed on medical leave.

115.   Plaintiff was approved for disability and FMLA leave by Defendant, CSA.

116.   Defendant violated the FMLA by harassing, discriminating against, and/or retaliating against Plaintiff in significant part because she exercised rights under the FMLA.

117.   Defendant has also taken adverse employment actions against Plaintiff due to her disability by refusing to promote her due to disability and use of FMLA.

118.   As a direct and proximate result, Plaintiff has sustained damages including, but not limited to loss of income and attorney fees.

WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants, in an amount in excess of $75,000.00, plus her reinstatement to the position she was to have assumed on January 1, 2020, exemplary damages, together with costs, interest and attorney fees and any other relief this Honorable Court deems appropriate.

## COUNT IV
## DISCRIMINATION IN VIOLATION OF 29 U.S.C. § 2614(a)(1)

119.   Plaintiff incorporates by reference paragraphs 1 through 118 of the Complaint as though fully set forth herein.

120.   CSA was Plaintiff's "employer" within the meaning of 29 U.S.C. § 2614(a)(1).

121.   Employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.

122.   Plaintiff engaged in activity protected by the FMLA when she requested and was given the impression, she was approved for FMLA leaves.

123.   The FMLA leaves were approved by Defendant.

124.   Defendant took adverse action against Plaintiff by threatening to withhold a promotion for using FMLA time.

125.   As a result of Plaintiff asserting her right to a FMLA leave, she was subjected to adverse employment actions, including being denied promotions due to her disability and use of FMLA.

126.   As a direct and proximate result, Plaintiff has sustained damages including, but not limited to the following:

   a.  Loss of income;

   b.  Loss of fringe benefits;

   c.  Emotional pain and suffering;

   d.  Severe mental anguish and distress;

   e.  Embarrassment and humiliation;

   f.  Loss of earnings and other employment benefits; and

24

g.  Costs and attorney fees.

W WHEREFORE, Plaintiff respectfully requests judgment in her favor and against Defendants, in an amount in excess of $75,000.00, plus her reinstatement to the position she was to have assumed on January 1, 2020, exemplary damages, together with costs, interest and attorney fees and any other relief this Honorable Court deems appropriate.

Respectfully submitted,

**BATEY LAW FIRM, PLLC**

By: /s/Scott P. Batey
     SCOTT P. BATEY (P54711)
     Attorney for Plaintiff
     30200 Telegraph Road, Suite 400
     Bingham Farms, Michigan 48025
     (248) 540-6800-telephone
     (248) 540-6814-fax
     sbatey@bateylaw.com

Dated: May 1, 2020

## <u>DEMAND FOR JURY TRIAL</u>

NOW COMES Plaintiff, Gabrielle Corrent, by and through her attorney's, Scott P. Batey and the Batey Law Firm, PLLC, and hereby demands a trial by jury on all issues allowed by law.

Respectfully submitted,

**BATEY LAW FIRM, PLLC**

By: /s/Scott P. Batey
SCOTT P. BATEY (P54711)
Attorney for Plaintiff
30200 Telegraph Road, Suite 400
Bingham Farms, Michigan 48025
(248) 540-6800-telephone
(248) 540-6814-fax
sbatey@bateylaw.com

Dated: May 1, 2020